of Arizona, and North County Communications Corporation of Oregon. This case is about interconnection agreements, but what this case is not about is whether or not these previous interconnection agreement, and it's not about whether the old interconnection agreement from 1997 included provisions that needed to be amended. This case is about violations of the congressional mandates in the 1996 Telecom Act, and it basically breaks down into two violations. The first violation is the Oregon Commission's referral, refusal to allow North County to use an existing interconnection agreement that another carrier was using at the time, and it happened to be the same agreement that North County had from 1997 until 2011. The second issue applies to both the Arizona and the Oregon Commissions, and this is the issue of not allowing North County in either state to demand and get indirect interconnection. Well, isn't the essence of this appeal having to do with whether binding arbitration could be enforced? The appeal is really, that's the second portion. The continue to call them QUEST, probably call them U.S. West. Can QUEST demand and require North County to remain in a direct interconnected environment with QUEST? Well, I'm still focused on the arbitration issue. Doesn't the interconnection agreement permit arbitration? The statute itself... I'm talking about the agreement, the ICA. The 1997 ICA, is that the agreement that you're asking about in particular? It was, it said that the parties would enter into negotiations. It actually said they would enter into negotiations two years after the effective date, which would have been in 1999, but it wasn't until 2008 that QUEST approached North County and said, let's enter into these negotiations. Is that a yes or a no to my question? Indirectly, it's a yes, because once you enter into a negotiation, you're allowed to, under the Act, Section 252 of the Telecom Act, you're allowed to petition for arbitration if you can't resolve the issues that are being negotiated. Your position is, if I understood your last statement correctly, and please, let's be precise. Once the parties enter into negotiations, either party can request arbitration. True? Once the parties enter into valid negotiations, either party can request arbitration. What are invalid negotiations? When QUEST, the incumbent local exchange carrier, seeks to negotiate a direct interconnection agreement and says to North County, we're going to enter into a direct interconnection agreement. If QUEST requests the negotiations, it is invalid negotiation? Is that right? If QUEST requests the negotiation, yes. To say, you have to enter into a direct interconnection agreement with me as an incumbent local exchange carrier. Let's suppose you're right, sir. Let's suppose that QUEST makes an invalid request for negotiations. Got that? Yes. And NCC agrees to enter negotiations. And NCC then does something in negotiations, which is to request something in negotiations, which is what happened. Then has not NCC requested negotiations? Only one party can get that negotiation ball rolling. But both parties request negotiations when they negotiate, because negotiations are made up of requests for concessions to either side. Now, doesn't a commonsensical reading of the statute allow negotiations to be requested by both sides? No. Okay, why not? Because that's not the language of the statute. The language of the statute says, in section 252, that when an incumbent local exchange carrier receives a request to negotiate an interconnection agreement, it doesn't say when a competitive local exchange carrier... Doesn't an incumbent, an ILEC, let's call it, receive a request for negotiations when the CLEC makes a demand or a request for a concession in negotiations? That happened in 1997, yes. So, and it happened again all during the period of time when you, your client, was in writing, stipulated that the arbitration period of 135 to 160 days could be extended, and arbitration could be requested by either party. But if North County backs out of arbitration or says, I'm not moving forward with these negotiations, I'm not moving forward with this arbitration, the commission under the statute is required to move forward and impose an agreement anyway. What I'm trying to say is that under section 251 of the Act, you connect directly, which And that means you're going through a third party. North County would not have a direct relationship with Quest at that point. There would be a third party that provides a tandem where Quest's network goes to the third party, and North County's network goes to that third When North County and Oregon asked for the agreement that was in existence, they were told that, well, they wouldn't make it available to them because the carrier using that agreement was using it for something else. They were ordering different types of circuits, and that agreement just simply wouldn't be made available to North County. And while it's possibly true that that carrier was using it in a different fashion, it's not the law. The law is the agreement exists, and the agreement can be selected by another carrier or a competitive carrier. So when the Oregon Commission did not allow, and when Quest did not allow North County to adopt that agreement, they violated section 252I of the Act. Counsel, back to the ICA for just a moment. Is it your position that somehow or other the ICA is void, is in conflict with the statute? The ICAs that were imposed on North County I'm focusing on the 97 one primarily. No, the 97, those were agreements that were adopted by North County. Well, both parties, right? Yes. It was an agreement that Quest had with a different carrier, and North County said, in both states, we'll take that agreement. And they continued to operate together, and their relationship was governed by that agreement until 2011. Right. But under the 97 agreement, it was possible to negotiate changes, and for that matter, to call for arbitration, no? Well, there are two different things. Negotiating changes, there's actually an amendment provision in the 1997 interconnection agreement. And that's not the same as going to the commission and requesting arbitration. In fact, as the law changed, there were several amendments that were added to the 1997 interconnection agreement. Well, let me ask you, is the ICA, from your point of view, the 97 ICA, is that is in the ICA that may not have been in the statute, is still relevant? There are no provisions in the 97 ICAs that violate the current status of the law in 2011. There was nothing in there that needed to be amended to bring in compliance with the Telecom Act and subsequent decisions by the FCC. This business about forcing a direct connection versus an indirect connection, was that specific objection raised in the district court? That was raised in the district court, and it was raised at the state commissions. And it was raised in the beginning when North County said, here's what we really want. We like our agreement. Someone in Oregon has it. Let us keep our agreement. And they said, no, we can't have the agreement. And they said, well, listen, let's just go to indirect interconnection. Inquest said, no, we're not doing indirect interconnection. Maybe I'm overlooking it. I have so much stuff on this case. But was that addressed at all in the district court rulings, this direct versus indirect connection? I seem to recall that it was. I may have overlooked it. My impression was this is coming up for the first time on appeal. It wasn't brought up below. No, it was brought up originally when North County filed the motions to dismiss, saying that the commissions didn't have the right to arbitrate these agreements. And it was also brought up in the district court cases as the third-party interconnection issue. What about the actual terms of the agreement itself? Could you talk about those? The resulting 2011 agreement? Yeah. Those were addressed, and we've certainly addressed those in the brief. And those are the specific discriminatory, the specific unlawful provisions that shouldn't be allowed to be upheld in the interconnection agreements. There is no reason that Quest gets to charge North County for installation of its network for the interconnection, but North County is prohibited from assessing a reciprocal charge. There's no reason that Quest gets to choose what the proper signaling method is. And this is the MF versus SS7 issue. There's no reason. Why don't they get to choose that? I think as the incumbent, they would not be allowed to. They aren't the FCC. They don't get to say, this is a signaling technology that is valid, and anything else, we're just not going to allow. Why not? It's their system, isn't it? Well, there are ways that they can still interconnect using, North County's using MF technology. And again, the indirect route would resolve this issue completely, because a third-party tandem provider is going to interconnect with Quest on its side. I guess you made a categorical statement that I'm just not clear about. Why can't Quest say we want to adopt SS7 as the technology? They don't get to set a nationwide or even a region-wide technology. They don't get to allow the incumbent local exchange carrier such an advantage. They could adopt something new every six months if they wanted to. Every two years. Who polices that, the FCC? The FCC polices that? Well, the FCC has acknowledged SS7 is a valid technology. MF, which is multi-frequency, that's a valid technology. I'm out of my depth here, but I don't know of anything from the FCC that says companies in Quest's position can't adopt the SS7 technology and require it. I suppose you're correct. I suppose there is nothing that specifically says... And isn't the whole industry moving toward SS7 and MF is an ancient system, ancient technology? That is true. That is true. It's not waxed string and aluminum cans, but it's an older technology. Are your clients unable to adopt SS7 for some reason? It's partly cost prohibitive, and it would require a lot of money. It would require a big investment from the client. So it's the cost issue from your point of view? Yes. I would like to reserve the balance of my time. You may do so, counsel. Thank you. We'll hear from the other side, or sides, I should say. We have three different appellees. Good morning, Your Honors. May it please the Court. Lawrence Reichman with Perkins Coie for Appellee Quest Corporation, and following me will be counsel for the Arizona Commission and the Oregon Commission. Counsel, your side has 20 minutes total, so however you allocate your time is fine as long as you understand that. Yes. Thank you. I'll keep my eye on the clock. The original agreement in this case dated from 1997, one year after the Telecom Act was passed. Originally, North County requested interconnection with Quest in both states. It chose to opt into an existing agreement. That agreement required North County to use its best efforts to transition to SS7 signaling. That was 1997. It also required the parties to negotiate a new agreement starting in two years. NCC did not transition its signaling system, which has led to a number of significant billing disputes and overpayments by Quest, nor did the parties negotiate a new agreement within the first two and a half years. It was amended several times. However, by 2008, Quest had discovered these significant billing problems and overpayments and requested a renegotiation of the agreement to address those changes, to address those problems, and also to address changes in Quest's product offerings and business practices over 11 years. Significant motivation for requesting the change was the fact that NCC had never updated its signaling system from MF. Quest's intention in the negotiations was to accommodate NCC's desire to continue using this outdated technology, but at the same time protect Quest from unfair bills. All the decisions by both state commissions are supported by substantial evidence and so first with respect to the authority of the commissions to arbitrate, Judge Bea had some questions about Request and that sort of thing. Well, the position of the appellant is that there is a condition precedent in 252B1 that the arbitration can only take place if there's a request for negotiation on behalf of the by the competitive carrier against the incumbent carrier. And a reading of the statute doesn't quite say condition precedent, but it does, it's the only instance that is covered by the statute. And we have in this circuit adopted a rule of statutory construction which is called Expressio Unaeus and adopted it in a copyright case, which I remember quite well because I dissented. So that being so, if there's only one expression in the statute as to how arbitration can be commenced, isn't that the only way the statute allows arbitration to be commenced? Well, first let me say that the expression in the statute is not jurisdictional. It does not say that the state commissions may only or shall only or only have jurisdiction to arbitrate in this circumstance. No, but it relates the circumstances under which arbitration can take place and it only has one circumstance. Understood. And in the court's, in this court's jurisprudence, there's a case Forrester v. Chertoff, 500 F. 3rd, 920, which would consider this to be a claim processing rule. Is that in one of the briefs? It is not, which is why I wanted to bring it to your attention. Before you leave the courtroom, please provide copies to the other side and three copies for the court. Okay, I may, may I follow up with that? I do not have copies with me. No, the deputy will give you the form. Oh, okay. Thank you. Yes. So it's a claim processing rule. It doesn't affect the jurisdiction of the commissions. Therefore, it can be waived. It can be modified by agreement of the parties. And we submit that there are many ways in which the parties agree to modify or waive any requirement that quest init, that, that North County initiate the request to renegotiate the agreement. First, it was agreed to in the 1997 agreement when it said that both, that the parties would negotiate a new agreement. Both parties agreed to that. Secondly, quest sent the request for, for renegotiation, indicated that it would terminate the agreement absent an agreement to, to renegotiate, which North County agreed quest had the right to do, had the right to terminate. North County agreed to negotiate, negotiated for 18 months, in fact, never raising the issue that the request for negotiation was invalid. After the negotiations failed, quest filed a petition for arbitration. And North County's response, they characterized that as a, as a reasonable request. And they acknowledged that both parties had the right to request arbitration. And they continued to negotiate. Now, is there a particular part of the ICA, the 97 ICA that you rely upon for the right to arbitrate? No. Other than the fact that the, the agreement to re, to renegotiate, that, that's, that's what we rely on, is that there was, both parties agreed to renegotiate and to agree to commence those negotiations within two years. So, we would submit that that's... But what is it that you rely upon to justify the right to arbitrate, or the right to compel arbitration? Well, in fact, we would rely initially on the initial request for interconnection that preceded the 97 agreement. The notion, I think, in Section 252, is that CLEC should decide where they want to compete, where they want to interconnect. So, they initiate that interconnection by requesting interconnection with an ILEC. In other words, ILEC shouldn't be going around the country saying, I want to take advantage of your network, Mr. CLEC, and I want to interconnect with you. That happened, that request happened already back in 97, and the parties interconnected their networks at that point. Counsel, I hate to be a stick in the mud about the language of the statute. 252A1 talks about a request for interconnection, and that leads to voluntary negotiation. 252B1 talks about a request for negotiations, which leads to arbitration. So, a request for interconnection is not, at least in language, the same as a request for negotiation, is it? Fair point. Then I would say that in 97, they requested a negotiation. I mean, they requested the initial negotiation for the agreement. But then, they requested an initial interconnection then. Then you had a contract, which provided for further negotiations. Where is there in the record some evidence that NCC requested a further negotiation? Other than their participation in the negotiation, as you were referencing, they were quite happy with the original agreement, because it allowed... Actions speak louder than words? Absolutely. Absolutely. They were quite happy with the 97 agreement, because it allowed them to overbill and get away with it. The 97 agreement was for a term of, what, two and a half years, something like that? Yes, two and a half years. What would have happened if there had been no negotiation? Would they have just been cut off, or what happens? It was in evergreen status. It specifically said it would continue, in effect, until replaced by a new agreement. Which happened in 2011. Correct. And just let me mention one more point, and then I want to address the direct interconnection very quickly before I cede to my other counsel here. The FCC has specifically ruled on this issue, and said that an ILAC may request, may initiate negotiations for an amendment to an existing interconnection agreement, and then request arbitration if those negotiations fail. So the FCC has addressed this. Is it your position that the FCC ruling is binding on us as to the interpretation of the statute under the Chevron case? Yes. What's the ambiguity in the statute which triggers the Chevron case? The Chevron case is a two-step process. Fair point. My argument is that it's binding under the Hobbs Act. We also believe it's entitled to deference, but my primary argument is that it's binding under the Hobbs Act. It can only be challenged in a court of appeals that has jurisdiction over that decision. Let me just quickly address the indirect interconnection issue. This is an issue that relates to a treaty agreement, so it's reviewed under the arbitrary and capricious standard. The North County did not raise a request for indirect interconnection during the negotiations in either state. It did not request a term providing for indirect interconnection in its response to quest petitions in either state. It did not raise this issue at all in the Oregon proceeding. It raised it late in the Arizona proceeding, and the Arizona Commission did address it, but the evidence in this case— It raised in district court in the Arizona proceeding? It did on judicial review, yes. No additional evidence was submitted, of course. The evidence before the Arizona Commission was that there were a number of technical issues that need to be addressed in the event of indirect interconnection, and the Commission found that the parties had not negotiated those, and it had no record on which to establish terms for indirect interconnection. So it said that the parties will interconnect directly, and it did not flatly refuse indirect interconnection. It did not prohibit it forever. It simply said, and the contract reflects this, that if the parties want indirect interconnection, they need to negotiate and agree to terms, and the agreement specifically says you can do that, and in the four years since that agreement has been in effect, North County has never requested to negotiate those terms. At this point, I'd like to let counsel for Arizona Commission speak. Good morning, Your Honors. My name is Maureen Scott, and I'm appearing on behalf of the Arizona Corporation Commission today. The Arizona Corporation Commission respectfully requests that this Court affirm the well-reasoned decision of the Arizona District Court in its entirety. This will also result in an affirmance of the Arizona Commission's decision. Counsel, I'm having trouble with affirming based on the decision of the District Court. I'm wondering if we might look at this from a narrower standpoint. In other words, instead of relying on the statute, which has some issues, statutory interpretation issues, what about relying on passages in the ICA? Your Honor, I think that's a very good point. However, if I could address the statute first. Well, we've been talking about the statute, and I still have these concerns. Do you have no comment on the ICA? I do, Your Honor. Let me hear it. The 1997 ICA language actually supports CenturyLink's ability to request negotiation and seek arbitration by the Commission. What specific portions of the ICA supports that statement? Your Honor, the 1997 ICA provision allowed both parties to initiate negotiation on a new agreement. Can you give us a section number or a page number or a passage? Yes, I can. All right. I would refer you to Exhibit Q6. It's CR Tab C-6 at 69. Say that again slowly, the citation. Let me see if I can. It's CR. ER? CR. CR. Tab C-6. What does CR mean? Let's see here. You're not referring to the excerpt of the record, or are you? Yes. One moment, please. Okay. EOR 8 colon 20-22. And I believe counsel for the Oregon Commission can also supplement that site if needed. I guess I'm having trouble. I have quite a few excerpts of the record and I have the QS ER, but I'm not sure I can find 8 colon 20-22. Where would I find that? Are you talking about the EOR 8, the order of the district court, page 8, line 20-22? Because that's what I have here. I'm referring to an ICA provision, which we believe allowed both parties to negotiate  Ms. Morgan, we're trying to find out what ICA provision you have in mind. Yes. Can I read it to you, Your Honor? Tell us the section or the ER page where we can actually read it ourselves. That's what we would like to do. Your Honor, it's in section XXX1B, parent B, of the 1997 ICA. Okay, and what page of the record can I find that in? QS ER-069, paragraph 6. That's in the joint statement of facts? Yes. Do you mind if I peek? Okay, I'm looking at 69. Now, what part of 69 am I looking at? The actual provision is... Is it agreed fact number 6? Paragraph 6. Paragraph 6. Shall be effective for a period of two and a half years, reinforced until a new agreement. But it says nothing about arbitration. Well, Your Honor, I'm referring to negotiation. I believe that this provision in the 1997 Act allowed either party to negotiate the provisions of a new agreement. But your opponent is saying that you have no power to compel arbitration. That's the issue in this case, is it not? Yes. Okay, so what is it that we can look to that is relevant to that? Maybe it's paragraph 9 on page 70. Or 71, rather. Sorry, 70. Paragraph 9. Agree to a series of extensions of the arbitration window to file a petition for arbitration. That one? And, Your Honor, could I follow up on why we believe that we have the power to arbitrate, given this provision? As you answer our question... Okay, I'm sorry. This specific provision of the 97 ICA supports your position. The one that I just noted in paragraph 6. All that says is that you have an agreement for two and a half years until a new agreement. And that the parties agree to negotiate. Yes. A new agreement. But where does that say anything about the new agreement will have an arbitration provision, or that the old agreement has an arbitration provision? Well, either party can commence negotiations. And NCC's argument is, because Quest requested negotiation in this case, that... the statute, which he argues, limits the request to arbitration to the other side. In other words, Quest does not have that power in the statute. Right. But this is an agreement, and the parties agreed here that either party could negotiate, commence negotiations on a new agreement. Can the parties decide to bestow upon themselves a power which Congress did not? Well, I think with respect to voluntarily negotiated agreements, the parties can come to agreements that aren't necessarily reflective of the requirements of the statute. What happens when the negotiations fail? If the negotiations... Failed, right? If the negotiations fail, which they did... Then what happened? Then either party has the right to come to the commission... I'm not asking you what their rights are. What actually happened? What happened when the negotiations failed? The negotiations failed, and the parties started... Did Quest request arbitration? Yes, Quest ultimately requested arbitration. Was there an objection to the request for arbitration at that time? No, there was not. Thank you, counsel. The time for your side has expired. Thank you. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Silverman, Bea